[No. C024295. Third Dist. Nov. 20, 1997.]

KATHLEEN CONNELL, as Controller, etc., et al., Petitioners, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
SANTA MARGARITA WATER DISTRICT et al., Real Parties in Interest.

**COUNSEL**

Daniel E. Lungren, Attorney General, Floyd D. Shimomura, Assistant Attorney General, Linda A. Cabatic and Susan R. Oie, Deputy Attorneys General, for Petitioners.

No appearance for Respondent.

James A. Curtis for Real Parties in Interest.

**OPINION**

SIMS, J.—This case involves a dispute as to whether a statewide regulatory amendment, increasing the level of purity required when reclaimed wastewater is used for certain types of irrigation, constitutes a state-mandated program for which water districts are entitled to reimbursement from the state. (Cal. Const., art. XIII B, § 6 (hereafter, section 6);[1] Gov. Code, § 17500 et seq.; former Rev. & Tax. Code, § 2201 et seq.) The State Controller and State Treasurer appeal from a trial court judgment granting

---

[1]Section 6 provides: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service, except that the Legislature may, but need not, provide such subvention of funds for the following mandates: [¶] (a) Legislative mandates requested by the local agency affected; [¶] (b) Legislation defining a new crime or changing an existing definition of a crime; or [¶] (c) Legislative mandates enacted prior to January 1, 1975, or

petitions for writ of mandate brought by Santa Margarita Water District (SMWD), Marin Municipal Water District, Irvine Ranch Water District and Santa Clara Valley Water District (the Districts), seeking to enforce a State Board of Control (the Board) decision which found the regulatory amendment constituted a reimbursable state mandate.[2] Appellants contend the trial court erred because (1) the amendment did not constitute a new program or higher level of service in an existing program; (2) the Districts' claim was abolished when the statutory basis for their claim—former Revenue and Taxation Code section 2207—was repealed before their rights were reduced to final judgment, and (3) the Districts' authority to levy fees to pay for the increased costs defeats their claim of a reimbursable mandate. Appellants also challenge the trial court's determination that they were collaterally estopped from challenging the Board's decision (finding a reimbursable state mandate) by their failure timely to seek judicial review of the administrative decision. We shall conclude the Districts' authority to levy fees defeats their claim of a reimbursable mandate, and appellants are not collaterally estopped from raising this matter. We therefore need not address the other contentions. Treating this appeal from a nonappealable judgment as an extraordinary writ petition, we shall direct the trial court to vacate its judgment and enter a new judgment denying the Districts' petitions.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1975, the State Department of Health Services (DHS) adopted regulations (Cal. Code Regs., tit. 22, §§ 60301-60357) implementing Water Code section 13521, which provides: "The State Department of Health Services shall establish uniform statewide recycling criteria for each varying type of use of recycled water where the use involves the protection of public health." Section 60313[3] of title 22 of the California Code of Regulations prescribed the level of purity required for reclaimed water to be used for landscape irrigation.

---

executive orders or regulations initially implementing legislation enacted prior to January 1, 1975."

[2]The trial court first held proceedings in the matter of the petition filed by the SMWD. The other three water districts had filed petitions, which were consolidated and awaiting hearing. The parties to the consolidated case filed a stipulation indicating they did not wish to relitigate the entitlement issues already decided by Judge Ford in the SMWD case, and they stipulated to assignment of their cases to Judge Ford pursuant to California Rules of Court, rule 213 (assignment to one judge for all or limited purposes), for determination of amounts as to each district. The judgment expressly covers the petitions of all four districts.

[3]California Code of Regulations, title 22, section 60313, initially provided: "Landscape Irrigation. Reclaimed water used for the irrigation of golf courses, cemeteries, lawns, parks, playgrounds, freeway landscapes, and landscapes in other areas where the public has access shall be at all times an adequately disinfected, oxidized wastewater. The wastewater shall be considered adequately disinfected if at some location in the treatment process the median number of coliform organisms does not exceed 23 per 100 milliliters, as determined from the

In May 1976, SMWD adopted a plan to develop a wastewater reclamation system. In August 1976, SMWD filed an application with the responsible regional water quality control board (Water Control Board) for a permit to discharge wastewater from the proposed reclamation system. SMWD also planned to provide reclaimed water for irrigation, potentially to 2,173 acres of land.

In February 1977, the Water Control Board issued SMWD a permit for operation of a reclamation system—the Oso Creek facility. The permit required SMWD to comply with all applicable wastewater reclamation regulations then in effect.

In late 1977, SMWD learned DHS might be considering modifications to the California Code of Regulations, title 22 regulations.

In August 1978, SMWD completed construction of the Oso Creek facility, at a cost of $17 million.

In September 1978, DHS amended the regulations. The amendment to California Code of Regulations, title 22, section 60313[4] increased the level of purity required before reclaimed wastewater could be used for the irrigation of parks, playgrounds and school yards. It is this amendment which allegedly constituted a state-mandated cost. SMWD modified its facility to comply with the amended regulations, completing the modifications in 1983.

---

bacteriological results of the last 7 days for which analyses have been completed." (Former § 60313, Cal. Code Regs., tit. 22, Register 75. No. 14 (Apr. 5, 1975).)

[4]Section 60313 of California Code of Regulations, title 22, as amended, provides: "(a) Reclaimed water used for the irrigation of golf courses, cemeteries, freeway landscapes, and landscapes in other areas where the public has similar access or exposure shall be at all times an adequately disinfected, oxidized wastewater. The wastewater shall be considered adequately disinfected if the median number of coliform organisms in the effluent does not exceed 23 per 100 milliliters, as determined from the bacteriological results of the last 7 days for which analyses have been completed, and the number of coliform organisms does not exceed 240 per 100 milliliters in any two consecutive samples.

"(b) Reclaimed water used for the irrigation of parks, playgrounds, schoolyards, and other areas where the public has similar access or exposure shall be at all times an adequately disinfected, oxidized, coagulated, clarified, filtered wastewater or a wastewater treated by a sequence of unit processes that will assure an equivalent degree of treatment and reliability. The wastewater shall be considered adequately disinfected if the median number of coliform organisms in the effluent does not exceed 2.2 per 100 milliliters, as determined from the bacteriological results of the last 7 days for which analyses have been completed, and the number of coliform organisms does not exceed 23 per 100 milliliters in any sample."

On October 1, 1982, SMWD filed a "test claim"[5] with the Board, alleging the regulatory amendment relating to the use of reclaimed wastewater constituted a new program or higher level of service. The test claim was made pursuant to former Revenue and Taxation Code section 2231,[6] which required reimbursement to local agencies for costs mandated by the state (see now Gov. Code, § 17561[7]), and former Revenue and Taxation Code section 2207, subdivisions (a) and (b)[8] defining "costs mandated by the state." (See now Gov. Code, § 17514.[9]) The test claim also cited section 6 (fn. 1, *ante*).

---

[5]At the time in question, "test claim" meant "the first claim filed with the State Board of Control alleging that a particular statute or executive order imposes a mandated cost on such local agency or school district." (Former Rev. & Tax. Code, § 2218; Stats. 1980, ch. 1256, § 7, p. 4249.) "Estimated claims" and "reimbursement claims" were used to make specific demand against an appropriation made for the purpose of paying such claims. (*Ibid.*)

A similar structure, distinguishing between "test claims" and various "reimbursement claims" or "entitlement claims" continues presently in Government Code sections 17521-17522.

At the time in question, the statutory procedure provided that if the Board found a mandate, it did not determine the amount to be reimbursed to the test claimant; rather, the Board then adopted a statewide cost estimate which was reported to the Legislature. (Stats. 1980, ch. 1256, p. 4246 et seq.; Stats. 1982, ch. 734, p. 2911 et seq.) It was the State Controller who determined specific amounts to be reimbursed, after the Legislature appropriated funds for that purpose. (*Ibid.*)

[6]Former Revenue and Taxation Code section 2231 provided in part: "(a) The state shall reimburse each local agency for all 'costs mandated by the state,' as defined in Section 2207. . . ." (Stats. 1982, ch. 1586, § 3, p. 6264.)

[7]Government Code section 17561 provides in part: "(a) The state shall reimburse each local agency and school district for all 'costs mandated by the state,' as defined in Section 17514. . . ."

[8]Former Revenue and Taxation Code section 2207 provided in part: " 'Costs mandated by the state' means any increased costs which a local agency is required to incur as a result of the following: [¶] (a) Any law enacted after January 1, 1973, which mandates a new program or an increased level of service of an existing program; [¶] (b) Any executive order issued after January 1, 1973, which mandates a new program . . . ." (Stats. 1980, ch. 1256, § 4, pp. 4247-4248.)

The test claim did *not* invoke other subdivisions of former Revenue and Taxation Code section 2207, concerning "(c) Any executive order issued after January 1, 1973, which (i) implements or interprets a state statute and (ii), by such implementation or interpretation, increases program levels above the levels required prior to January 1, 1973. [¶] . . . [¶] . . . (h) Any statute enacted after January 1, 1973, or executive order issued after January 1, 1973, which adds new requirements to an existing optional program or service and thereby increases the cost of such program or service if the local agencies have no reasonable alternatives other than to continue the optional program." (Stats. 1980, ch. 1256, § 4, pp. 4247-4248.) Since these subdivisions were not invoked, we have no need to consider them.

[9]Government Code section 17514 provides: " 'Costs mandated by the state' means any increased costs which a local agency or school district is required to incur after July 1, 1980, as a result of any statute enacted on or after January 1, 1975, or any executive order implementing any statute enacted on or after January 1, 1975, which mandates a new program or higher level of service of an existing program within the meaning of Section 6 . . . ."

On July 28, 1983, the Board determined the amended regulations imposed state mandated costs. In so doing, the Board rejected the position of state agencies seeking denial of the claim on the ground that local agencies are not mandated to use reclaimed water and because, if local agencies do choose to use it, they can recover the cost in charges made to purchasers of the water.

On January 19, 1984, the Board adopted "Parameters and Guidelines" establishing criteria for payment of claims to water districts pursuant to this mandate. (Former Rev. & Tax. Code, § 2253.2; Stats. 1982, ch. 734, § 10, pp. 2916-2917; Gov. Code, § 17557.)

On May 31, 1984, the Board amended its Parameters and Guidelines to provide for reimbursement of SMWD's cost of preparing and presenting the test claim.

In June 1984, the Board, pursuant to former Revenue and Taxation Code section 2255,[10] submitted to the Legislature a statewide cost estimate of $14 million for this mandate. The Legislature did not appropriate any funds for the mandate in 1984.

In 1985, the Legislature included an appropriation of almost $14 million for this state-mandated cost in the budget, but the Governor vetoed the appropriation.

In 1986, a bill including $945,000 for the subject mandate was introduced, but the bill was not enacted.

On January 27, 1987, SMWD filed in the trial court a petition for writ of mandate pursuant to Code of Civil Procedure section 1085. The petition sought an order directing (1) the State Controller to issue a warrant "to pay the State's obligation to SMWD for its 'costs mandated by the state' " and (2) the State Treasurer to pay the Controller's warrant.

---

[10]Former Revenue and Taxation Code section 2255 provided: "At least twice each calendar year the Board of Control shall report to the Legislature on the number of mandates it has found and the estimated statewide costs of such mandates. Such report shall identify the statewide costs estimated for each such mandate and the reasons for recommending reimbursement. . . . Immediately on receipt of such report a local governmental claims bill shall be introduced in the Legislature. The local government claims bill, at the time of its introduction, shall provide for an appropriation sufficient to pay the estimated costs of such mandates, pursuant to the provisions of this article." (Stats. 1980, ch. 1256, § 20, p. 4255.)

The current provision is contained in Government Code section 17600, which provides: "At least twice each calendar year the commission shall report to the Legislature on the number of mandates it has found pursuant to Article 1 (commencing with Section 17550) and the estimated statewide costs of these mandates. This report shall identify the statewide costs estimated for each mandate and the reasons for recommending reimbursement."

At a hearing, the trial court upheld the Board's decision that the amended regulations required a higher level of service and held the doctrines of waiver and collateral estoppel applied to that decision, such that the state, by failing to challenge the Board's decision within the three-year statute of limitations, was barred from challenging it now. However, the trial court did allow the state to argue that the amended regulations did not come within the definition of "program," as that word had recently been defined in *County of Los Angeles* v. *State of California* (1987) 43 Cal.3d 46, 56 [233 Cal.Rptr. 38, 729 P.2d 202].

The trial court recognized that, since there was no appropriation for this mandate in the state budget, the court could not grant the relief sought by SMWD (an order directing the Controller to issue a warrant and the Treasurer to pay it) unless the court found the existence of funds reasonably available in the state budget which could be tapped for this purpose. The trial court stated it was not prepared to find the existence of funds reasonably available without a full evidentiary hearing. Rather than use the Board's statewide estimate, the court believed it needed to know the amount to which each water district would be entitled before it could determine whether there were funds reasonably available in the budget. The trial court ruled the exact amount of money to be reimbursed to the Districts had never been determined and referred the matter to a referee to make that determination.

In February 1989, a court-appointed referee began evidentiary hearings to determine the amount of reimbursement for each water district.

In 1989, the Legislature repealed former Revenue and Taxation Code section 2207 (fn. 8, *ante*), defining "costs mandated by the state." (Stats. 1989, ch. 589, § 7, p. 1978.)

On July 29, 1994, appellants filed in the trial court a motion for judgment on the pleadings/motion to dismiss, arguing repeal of former Revenue and Taxation Code section 2207 destroyed any right to reimbursement and divested the court of jurisdiction to proceed. The motion also revisited the issue presented to and rejected by the Board, that the water districts' authority to levy fees defeated a finding that the costs were reimbursable.

In February 1995, the trial court issued its ruling denying appellants' motion for judgment on the pleadings and for dismissal. The court in its minute order determined repeal of former Revenue and Taxation Code section 2207 in 1989 had not destroyed the Districts' right to reimbursement pursuant to the Board's decision, because the Board's decision was reduced to "final judgment" before the statutory repeal. The court said the Board's

decision on July 28, 1983, became final in July 1986, when the applicable three-year statute of limitations for seeking judicial review lapsed. The Board's decision therefore conclusively established the Districts' right to reimbursement, and appellants were collaterally estopped from challenging the Board's decision. The court further said no discernible injustice or public interest precluded this application of collateral estoppel; rather, justice would be furthered by allowing the Districts to enforce their right to reimbursement as established by the Board.

The trial court further said the statutory authority of the Districts to levy service charges and assessments (Former Rev. & Tax. Code, § 2253.2, subd. (b)(4);[11] Stats. 1982, ch. 734, § 10, p. 2916; Gov. Code, § 17556[12]) did not bar reimbursement for state-mandated costs. "When the Board determined that the 1978 amendment of the regulations establishing reclamation criteria imposed reimbursable state-mandated costs, it rejected the argument of the State Departments of Health Services and Finance that the costs were not reimbursable pursuant to former Revenue and Taxation Code section 2253(b)(4) and implicitly determined, in accordance with the presentation of [Santa Margarita Water District] that [the Districts] did not have sufficient authority to levy service charges and assessments to pay for the increased level of service mandated by the 1978 regulatory amendment. This implicit determination, resolving a mixture of legal and factual issues, became final and binding on respondents under the doctrine of collateral estoppel when they failed to seek judicial review of the Board's decision within the three-year limitations period."

At a further hearing concerning the amount owed to each water district, the trial court stated it had erred in referring the matter to a referee and should have rendered a judgment directing the Controller to determine the amounts owed.

On June 3, 1996, the trial court entered a judgment stating (1) the Board's decision was final at the time the petitions were filed in the trial court; (2)

---

[11]At the time SMWD filed its test claim, former Revenue and Taxation Code section 2253.2 provided in part: "(b) The Board of Control shall not find a reimbursable mandate . . . in any claim submitted by a local agency . . . if, after a hearing, the board finds that: [¶] . . . [¶] (4) The local agency . . . has the authority to levy service charges, fees or assessments sufficient to pay for the mandated program or level of service." (Stats. 1982, ch. 734, § 10, p. 2916.)

[12]Government Code section 17556 provides in part: "The [Commission on State Mandates (formerly the Board of Control)] shall not find costs mandated by the state, as defined in Section 17514, in any claim submitted by a local agency or school district, if, after a hearing, the commission finds that: [¶] . . . [¶] (d) The local agency or school district has the authority to levy service charges, fees, or assessments sufficient to pay for the mandated program or increased level of service."

the state mandate is a program for which reimbursement is due under *County of Los Angeles* v. *State of California, supra,* 43 Cal.3d 46; (3) the court having concluded it was inappropriate for the court to determine amounts of reimbursement, the Controller was directed to make that determination. The court directed issuance of a writ commanding the Controller to determine the amounts due to the Districts.

Appellants appeal from the judgment.

The Districts filed a cross-appeal, but we dismissed the cross-appeal pursuant to stipulation of the parties.

DISCUSSION

## I. *Appealability*

▪ Because the petition sought an order directing the Controller to issue a warrant and the Treasurer to pay a warrant but the judgment merely ordered the Controller to determine amounts without disposing of those matters, and because the record reflected the trial court's recognition that it could not order issuance or payment of warrants unless it determined appropriated funds for such expenditures were reasonably available in the state budget[13] (*Carmel Valley Fire Protection Dist.* v. *State of California* (1987) 190 Cal.App.3d 521, 538-541 [234 Cal.Rptr. 795])—a determination requiring an evidentiary hearing which was not held—we requested supplemental briefing on the question whether the judgment was a final appealable judgment, as opposed to an interlocutory judgment.

▪ An appealable judgment or order is a jurisdictional prerequisite to an appeal. (Code Civ. Proc., § 904.1; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, §§ 13-14, pp. 72-73.)

▪ An interlocutory judgment is not appealable; generally, a judgment is interlocutory if anything further in the nature of judicial action on the part of the trial court is essential to a final determination of the rights of the parties. (*Lyon* v. *Goss* (1942) 19 Cal.2d 659, 669-670 [123 P.2d 11].)

▪ In their supplemental briefs, both sides maintain the judgment is a final appealable judgment but for different reasons. Both sides are wrong.

---

[13]The petition for writ of mandate alleged there was a continuously appropriated State Mandates Claims Fund upon which the Legislature had placed restrictions which on their face made the fund inapplicable to the mandate at issue in this case. The petition further alleged these restrictions were unconstitutional, such that upon a judicial declaration of their unconstitutionality, there would exist funds reasonably available to pay SMWD. The trial court made no ruling on these matters. In this appeal, we need not and do not decide the propriety of the remedy sought by the Districts.

Appellants assert the judgment is final because nothing further remains to be done by the trial court. According to appellants, the Controller, after determining what amounts are due, is supposed to submit that amount to the Legislature to appropriate the funds (though the judgment contains no such direction). Appellants assert that, if the Legislature does not appropriate the funds, the Districts' remedy would be to file a new action in the superior court to enforce the court's prior order, and to compel payment out of funds already appropriated and reasonably available for the expenditures. Appellants assert it is thus premature to consider whether appropriated funds are reasonably available to pay any reimbursement due.

The Districts' supplemental brief, while agreeing the judgment is a final appealable judgment, disputes appellants' view of what happens after the Controller determines the amounts. The Districts maintain the trial court intended for appellants to pay the amounts determined by the Controller, despite the judgment's failure so to state. The Districts claim the unresolved factual question of the existence of available appropriated funds in the budget is merely "an administrative detail" which need not be addressed by the court except in a proceeding to enforce the judgment in the event appellants refuse to pay.

Both sides are wrong. Nothing in the judgment requires the Controller to submit an appropriations bill to the Legislature, and appellants cite no authority that would require such a procedure—which would duplicate steps previously undertaken in this case without success. Nor does anything in the judgment call for issuance or payment of warrants. *Carmel Valley Fire Protection Dist.* v. *State of California, supra,* 190 Cal.App.3d 521—a case discussed in the trial court and on appeal—recognized that a court violates the separation of powers doctrine if it purports to compel the Legislature to appropriate funds, but no such violation occurs if the court orders payment from an existing appropriation. (*Id.* at pp. 538-539.) Thus, the Districts' view of this matter as an administrative detail for a later postjudgment enforcement proceeding is unsupported.

We recognize this litigation arises from a "test claim," which merely determines whether a state-mandated cost exists. (See fn. 5, *ante.*) Perhaps no issue of payment should arise at all at the test claim stage, though neither side so argues.

In any event, the judgment plainly leaves matters undecided.

We conclude the judgment is interlocutory and therefore not appealable.

Nevertheless, on our own motion, we shall exercise our discretion to treat the appeal as a writ petition and shall grant review on that basis. (*Morehart*

v. *County of Santa Barbara* (1994) 7 Cal.4th 725, 743-744 [29 Cal.Rptr.2d 804, 872 P.2d 143] [treating appeal as writ petition is authorized means for obtaining review of interlocutory judgments].) We shall exercise our discretion to treat the appeal as a writ petition in the interest of justice and judicial economy, because the merits of the dispositive issues have been fully briefed, both sides urge review, and the judgment compels the Controller to engage in complex factfinding determinations which may be moot if the trial court erred on the merits of the mandate issues. Given the difficulties in discerning how the former statutory process of test claims was supposed to work in practice, we believe the interests of justice and judicial economy are best served by reviewing the judgment rather than dismissing the appeal.

We stress, however, that our review is limited to contentions raised in the briefs—which do not raise issues of the propriety of the remedy sought by the Districts. We express no view on whether the remedy sought by the Districts was an available or appropriate remedy.

## II. *Standard of Review*

In reviewing the trial court's ruling on a writ of mandate, the appellate court is ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial evidence. (*Evans v. Unemployment Ins. Appeals Bd.* (1985) 39 Cal.3d 398, 407 [216 Cal.Rptr. 782, 703 P.2d 122].) However, where the facts are undisputed and the issues present questions of law, the appellate court is not bound by the trial court's decision but may make its own determination. (*Ibid.*)

## III. *Collateral Estoppel*

We first address the trial court's determination that appellants were collaterally estopped from challenging the Board's determination of state-mandated cost (except for the ability to address the effect of a new Supreme Court case defining "program"). The trial court stated the Board's decision became final for collateral estoppel purposes in July 1986, when the statute of limitations for judicial review expired.

Appellants contend the trial court erred in applying collateral estoppel, because there was no "final judgment" for collateral estoppel purposes, since the amount of reimbursement had yet to be determined.

We conclude it is not necessary to decide the parties' dispute as to whether the requirements of administrative collateral estoppel are met, because even assuming the elements are met, the doctrine of collateral estoppel should be disregarded pursuant to the public interest exception.

Thus, our Supreme Court declined to apply collateral estoppel in a state-mandated costs case in *City of Sacramento* v. *State of California* (1990) 50 Cal.3d 51, 64-65 [266 Cal.Rptr. 139, 785 P.2d 522] (*Sacramento II*). There, a city and a county filed claims with the Board seeking subvention of costs imposed by a statute (Stats. 1978, ch. 2, p. 6 et seq., referred to in *Sacramento II* as "chapter 2/78") which extended mandatory coverage under the state unemployment insurance law to include state and local governments. The Board found there was no state-mandated program and denied the claims. On mandamus, the trial court overruled the Board and found the costs reimbursable. We affirmed the trial court in a published opinion. (*City of Sacramento* v. *State of California* (1984) 156 Cal.App.3d 182 [203 Cal.Rptr. 258] (*Sacramento I*).) On remand, the Board determined the amounts due on the claims, but the Legislature refused to appropriate the necessary funds. The city filed a class action seeking among other things payment of the state-mandated costs. The trial court granted summary judgment for the state on the grounds the statute did not impose state-mandated costs. The Supreme Court upheld the trial court's decision.

The Supreme Court in *Sacramento II* rejected the local agencies' argument that the state was collaterally estopped from relitigating the issue whether a state-mandated cost existed, because *Sacramento I* "finally" decided the matter. (*Sacramento II, supra*, 50 Cal.3d at p. 64.) The Supreme Court said: "Generally, collateral estoppel bars the party to a prior action, or one in privity with him, from relitigating issues finally decided against him in the earlier action. [Citation.] '. . . But when the issue is a question of law rather than of fact, the prior determination is not conclusive either if injustice would result or if the public interest requires that relitigation not be foreclosed. . . .' [Citation.]

"Even if the formal prerequisites for collateral estoppel are present here, the public-interest exception governs. Whether chapter 2/78 costs are reimbursable under article XIII B and parallel statutes constitutes a pure question of law. The *state* was the losing party in *Sacramento I*, and also the only entity legally affected by that decision. Thus, strict application of collateral estoppel would foreclose any reexamination of the holding of that case. The state would remain bound, and no other person would have occasion to challenge the precedent.

"Yet the consequences of any error transcend those which would apply to mere private parties. If the result of *Sacramento I* is wrong but unimpeachable, taxpayers statewide will suffer unjustly the consequences of the state's continuing obligation to fund the chapter 2/78 costs of local agencies. . . ." (*Sacramento II, supra*, 50 Cal.3d at p. 64, original italics.)

The Supreme Court also rejected the argument that res judicata applied. "Of course, res judicata and the rule of final judgments bar us from disturbing individual claims or causes of action, on behalf of specific agencies, which have been finally adjudicated and are no longer subject to review. [Citations.] However, the issues presented in the current action are not limited to the validity of any such finally adjudicated individual claims. Rather, they encompass the question of defendants' subvention obligations *in general* under chapter 2/78." (*Sacramento II, supra,* 50 Cal.3d at p. 65, original italics.)

If this court's opinion finding a reimbursable mandate in *Sacramento I* did not constitute a final adjudication precluding further consideration of the matter, a fortiori the Board's decision in the instant case does not constitute a final adjudication precluding further consideration. Thus, here, as in *Sacramento II,* the issues presented are not limited to the validity of any finally adjudicated individual claim, but encompass the question of subvention obligations in general under the regulatory amendment of wastewater purification standards. If the Board's decision is wrong but unimpeachable, taxpayers statewide would suffer unjustly the consequences of a continuing obligation to fund the costs of local water districts. We reject the Districts' argument that no public interest exists in this case because only a few local entities are involved.

The Districts suggest application of the public interest exception to collateral estoppel would nullify the legislative intent to avoid multiple proceedings by creating a comprehensive and exclusive procedure for handling state mandated costs issues in the administrative forum. (E.g., Gov. Code, § 17500.[14]) However, we are bound by Supreme Court authority applying the public interest exception in a state-mandated costs case. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369

---

[14]Government Code section 17500 provides in part: "The Legislature finds and declares that the existing system for reimbursing local agencies . . . for the costs of state-mandated local programs has not provided for the effective determination of the state's responsibilities under Section 6 . . . . The Legislature finds and declares that the failure of the existing process to adequately and consistently resolve the complex legal questions involved in the determination of state-mandated costs has led to an increasing reliance by local agencies and school districts on the judiciary and, therefore, in order to relieve unnecessary congestion of the judicial system, it is necessary to create a mechanism which is capable of rendering sound quasi-judicial decisions and providing an effective means of resolving disputes over the existence of state-mandated local programs. [¶] It is the intent of the Legislature in enacting this part to provide for the implementation of Section 6 . . . and to consolidate the procedures for reimbursement of statutes specified in the Revenue and Taxation Code with those identified in the Constitution. Further, the Legislature intends that the Commission on State Mandates, as a quasi-judicial body, will act in a deliberative manner in accordance with the requirements of Section 6 . . . ."

P.2d 937].) Moreover, contrary to the Districts' implication, the administrative decision is not the final word; the statutory scheme authorizes judicial review of the administrative decision. (Gov. Code, § 17559; former Rev. & Tax. Code, § 2253.5; Stats. 1977, ch. 1135, § 12, p. 3650.) Additionally, the instant judicial proceeding was initiated by the Districts, not by appellants. Thus, in this case application of the public interest exception to collateral estoppel is not creating multiple proceedings.

In light of the Supreme Court's decision in *Sacramento II*, we disregard earlier authority of an intermediate appellate court which applied administrative collateral estoppel to a question of law in a state-mandated costs case without express discussion of the public interest exception. (*Carmel Valley Fire Protection Dist.* v. *State of California, supra,* 190 Cal.App.3d at p. 536.)

We conclude that, insofar as appellants' contentions present questions of law, the public interest exception to administrative collateral estoppel governs, and we shall therefore address the legal arguments raised in appellants' brief.

## IV. *Authority to Levy Fees*

 Appellants contend that, even if the regulatory amendment is a new program for state mandated costs purposes, the Districts' authority to levy fees defeats a determination that the costs are reimbursable. We agree.

At the time SMWD filed its test claim, former Revenue and Taxation Code section 2253.2 provided in part:

"(b) The Board of Control shall not find a reimbursable mandate, pursuant to either Section 2250 of this code or to Section 905.2 of the Government Code, in any claim submitted by a local agency or school district, pursuant to subdivision (a) of Section 2218, if, after a hearing, the board finds that:

". . . . . . . . . . . . . . . . . . . .

"(4) The local agency or school district has the authority to levy service charges, fees or assessments sufficient to pay for the mandated program or level of service."[15] (Stats. 1982, ch. 734, § 10, p. 2917; Stats. 1980, ch. 1256, § 15, pp. 4253-4254.)

---

[15]This case presents no issue concerning any distinction between "service charges, fees or assessment," as used in the statute. The parties on appeal frame the issue in terms of the authority to levy "fees." We adopt their usage for the sake of simplicity.

The same provision is currently contained in Government Code section 17556.[16]

The facial constitutionality of this provision was upheld in *County of Fresno* v. *State of California* (1991) 53 Cal.3d 482 [280 Cal.Rptr. 92, 808 P.2d 235]. The *Fresno* court rejected an argument that the statute was facially unconstitutional as conflicting with section 6 (fn. 1, *ante*), which contains no exclusion of reimbursement where the local agency has authority to levy fees. Section 6 requires subvention only when the costs in question can be recovered solely from tax revenues. (53 Cal.3d at p. 487.) Government Code section 17556, subdivision (d), "effectively construes the term 'costs' in the constitutional provision as excluding expenses that are recoverable from sources other than taxes. Such a construction is altogether sound." (*County of Fresno* v. *State of California, supra*, 53 Cal.3d at p. 487.)

Here, appellants contend that, at all pertinent times, the water districts have had *authority* to levy fees to cover the costs at issue in this case. They cite provisions such as Water Code section 35470, which provides: "Any district formed on or after July 30, 1917, may, in lieu in whole or in part of raising money for district purposes by assessment, make water available to the holders of title to land or the occupants thereon, and may fix and collect charges therefor. The charges may include standby charges to holders of title to land to which water may be made available, whether the water is actually used or not. The charges may vary in different months and in different localities of the district to correspond to the cost and value of the service, and the district may use so much of the proceeds of the charges as may be necessary to defray the ordinary operation or maintenance expenses of the district and for any other lawful district purpose."

We agree this statute on its face authorizes the Districts to levy fees sufficient to pay the costs involved with the regulatory amendment. We thus shall conclude the Board erred in finding a right to reimbursement despite this authority to levy fees, and we shall conclude appellants are not collaterally estopped from pressing this point.

The Districts do not dispute they have authority to levy fees for the costs involved in this case. Instead they argue the real issue is whether they had

---

[16]Government Code section 17556 provides in part: "The commission [formerly the Board] shall not find costs mandated by the state, as defined in Section 17514, in any claim submitted by a local agency or school district, if, after a hearing, the commission finds that: [¶] . . . [¶] (d) The local agency or school district has the authority to levy service charges, fees, or assessments sufficient to pay for the mandated program or increased level of service. . . ."

"sufficient" authority. They claim this issue was a mixed question of law and fact, and appellants should be collaterally estopped from raising it.[17]

We agree with appellants that the public interest exception to collateral estoppel should be applied here, because the issue presents a pure question of law. The Districts tried to make it a factual issue, but we shall explain why the facts presented by the District were immaterial.

Thus, in proceedings before the Board (where Water Code section 35470 was cited to the Board by state agencies), SMWD did not argue it lacked "authority" to levy fees for this purpose. Instead, SMWD argued and presented evidence that it would not be economically desirable to do so. SMWD submitted declarations stating that rates necessary to cover the increased costs would render the reclaimed water unmarketable and would encourage users to switch to potable water. SMWD maintained that imposition of higher fees on users would contravene the legislative policy expressed in Water Code section 13512, which directs the state to undertake all possible steps to encourage development of wastewater reclamation facilities.

The Board made no express finding concerning this issue. The record contains only the Board minutes, which reflect a motion was made "To find a mandate and continue the issue regarding the claimant's ability to levy a service charge, to the parameters and guidelines process." There was no second to the motion. A motion was then made to find the regulatory amendment contained a reimbursable mandate. The motion carried. The minutes then state: "Discussion: Chairperson Yost disagreed with the motion as she felt the claimant could recover their costs by levying a service charge . . . ." The Board's Parameters and Guidelines stated in part: "If service charges or assessments were levied to defray the cost of the new criteria, the claim must be reduced by the amount received from such charges or assessment."

In proceedings before the trial court, SMWD admitted the district had the authority to levy fees but argued existence of authority was not enough, and the real question was whether it was economically feasible to levy fees sufficient to pay the mandated costs. Thus, SMWD's counsel stated at the hearing in the trial court: "The state keeps focusing on the question of whether the authority to issue, to assess fees and charges exists, and we have never contested that it didn't.

"But the statute which says that the Board cannot find the existence of a mandate if there's authority to assess fees and charges, and then the critical

---

[17]The Districts assert appellants are relying on evidence that was not before the Board. However, they do not explain what they mean or give us any reference to appellants' brief. We therefore disregard the assertion.

phrase, 'sufficient to pay for the mandated costs,' that's the condition with [*sic*] which they cannot satisfy.

"We proved that, the Board of Control hearing, through economic evidence. We proved it through testimony that the market was absolutely inelastic in terms of reclaimed water and potable water, that if you raise the price of reclaimed water over the potable water, that people would then buy the potable water, and that's all in the record.

"And so we showed that even though we have the authority, it was not sufficient to pay . . . ."

We note the record also reflects comments by SMWD's counsel to the trial court, that its customers were paying the increased costs as an "advance" against the state's obligation. The court pointed out users' payment of increased costs disproved the economic evidence SMWD had presented to the Board, that it could not raise its prices without losing its customers. The record also contains indications that the Districts funded the increased costs by diverting money from other sources. As will appear, we need not address this evidence, because it is not relevant to the question of authority to levy fees sufficient to fund the increased costs imposed by the regulatory amendment, which is a question of law in this case.

The trial court's minute order stated the districts' authority to levy fees did not bar reimbursement for state-mandated costs, because the Board "implicitly determined" the districts did not have "sufficient" authority to levy fees to pay for the increased service mandated by the 1978 regulatory amendment, and this "implicit determination, resolving a mixture of legal and factual issues, became final and binding on [appellants] under the doctrine of collateral estoppel when they failed to seek judicial review of the Board's decision within the three-year limitations period."

On appeal, appellants argue the sole inquiry is whether the local agency has "authority" to levy fees sufficient to pay the costs, and it does not matter whether the local agency, for economic reasons, finds it undesirable to exercise that authority. Appellants argue this presents a question of law, such that the public interest exception to collateral estoppel would apply (assuming the requirements of collateral estoppel are otherwise met).

We agree with appellants. ■ In construing statutes, our primary task is to determine the lawmakers' intent. (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 724 [257 Cal.Rptr. 708, 771 P.2d 406].) To determine intent, we look first to the words themselves. (*Ibid.*) "If the language is clear

and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . ." (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

 Here, the statute is clear and unambiguous. On its face the statute precludes reimbursement where the local agency has "authority" to levy fees sufficient to pay for the mandated program or level of service. The legal meaning of "authority" includes the "Right to exercise powers; . . ." (Black's Law Dict. (6th ed. 1990) p. 133, col. 1.) The lay meaning of "authority" includes "the power or right to give commands [or] take action . . . ." (Webster's New World Dict. (3d college ed. 1988) p. 92.) Thus, when we commonly ask whether a police officer has the "authority" to arrest a suspect, we want to know whether the officer has the legal sanction to effect the arrest, not whether the arrest can be effected as a practical matter.

Thus, the plain language of the statute precludes reimbursement where the local agency has the authority, i.e., the right or the power, to levy fees sufficient to cover the costs of the state-mandated program.

The Districts in effect ask us to construe "authority," as used in the statute, as a practical ability in light of surrounding economic circumstances. However, this construction cannot be reconciled with the plain language of the statute and would create a vague standard not capable of reasonable adjudication. Had the Legislature wanted to adopt the position advanced by the Districts, it would have used "reasonable ability" in the statute rather than "authority."

The question is whether the Districts have authority, i.e., the right or power, to levy fees sufficient to cover the costs. The Districts clearly have authority to levy fees sufficient to cover the costs at issue in this case. Water Code section 35470 authorizes the levy of fees to "correspond to the cost and value of the service," and the fees may be used "to defray the ordinary operation or maintenance expenses of the district and for any other lawful district purpose." The Districts do not demonstrate that anything in Water Code section 35470 limits the authority of the Districts to levy fees "sufficient" to cover their costs.

Thus, the economic evidence presented by SMWD to the Board was irrelevant and injected improper factual questions into the inquiry.

On appeal, the Districts briefly argue economic undesirability of levying fees constitutes a lack of authority to levy fees sufficient to cover costs. They claim the evidence before the Board showed SMWD "could not"

increase its fees because it was already charging as much for reclaimed as it was for potable water. However, the cited portion of the record does not show SMWD "could not" increase its fees but only that an increase would render reclaimed water unmarketable and encourage users to switch to potable water. The Districts cite no authority supporting their construction of former Revenue and Taxation Code section 2253.2 (now Gov. Code, § 17556) that *authority* to levy fees sufficient to cover costs turns on economic feasibility. We have seen the plain language of the statute defeats the Districts' position.

■ Since the issue in this case presented a question of law, we conclude the public interest exception to collateral estoppel applies. (*Sacramento II, supra*, 50 Cal.3d at p. 64.)

The Districts argue application of the public interest exception in this case raises policy concerns about the finality of administrative decisions on state-mandated costs, because if collateral estoppel does not apply in this case, it will never apply. However, we merely hold, in accordance with Supreme Court pronouncement, that the public interest exception to collateral estoppel applies under the circumstances of this case to this state-mandated cost issue which presents solely a question of law.

The Districts argue any fees levied by the districts "cannot exceed the cost to the local agency to provide such service," because such excessive fees would constitute a special tax. However, the districts fail to explain how this is an issue. No one is suggesting the districts levy fees that exceed their costs.

The Districts cite evidence presented to the referee in the aborted hearing to determine amounts owed to each District, that SMWD's director of finance testified SMWD has other sources of revenue from other services it provides (such as sewer service), maintains separate accounts, and borrowed funds internally from other accounts to cover costs incurred as a result of the subject mandate. The Districts assert this testimony reflects that SMWD "recognized the legal limitations on its authority to impose fees for the services that it provides." However, nothing in this evidence demonstrates any legal limitations on the authority to levy the necessary fees.

The Districts say appellants appear to believe the Districts should require users of other services to subsidize the Districts' cost of reclaiming and selling wastewater, through excessive user fees. However, we do not read appellants' brief as presenting any such argument and in any event do not base our decision on that ground.

In a footnote, the Districts make the passing comment: "In light of the adoption of Proposition 218, which added Articles XIII C and XIII D to the California Constitution this past November [1996], the authority of local agencies to recover costs for many services will be impacted by the requirement to secure the approval by majority vote of the property owners voting, to levy or to increase property related fees. See Section 6, Article XIII D." The Districts do not contend that the services at issue in this appeal are among the "many services" impacted by Proposition 218. We therefore have no need to consider what effect, if any, Proposition 218 might have on the issues in this case.

We conclude the Districts were not entitled to reimbursement of state-mandated costs, because they had authority to levy fees sufficient to pay for the level of service mandated by the 1978 regulatory amendment. Appellants were not collaterally estopped from raising this issue in the trial court. We thus conclude the Districts' mandamus petitions should have been denied. We therefore need not address appellants' contentions that (1) the regulatory amendment did not constitute a new program or higher level of service, or (2) any right to reimbursement was abolished upon repeal of former Revenue and Taxation Code section 2207.

### DISPOSITION

Let a peremptory writ of mandate issue, directing the trial court to vacate its judgment and enter a new judgment denying the Districts' petitions for writ of mandate. Appellants shall recover their costs on appeal.

Puglia, P. J., and Nicholson, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied February 25, 1998.